OSVALDO ORTIZ BÁEZ, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, PONCE PART, EDWIN MELÉNDEZ GRILLASCA, JUDGE, Respondent; THE PEOPLE OF PUERTO RICO, Intervener.

No. O-67-140.     Decided January 26, 1970.

*Efraín Goglas Carvajal* for petitioner. *J. B. Fernández Badillo, Solicitor General,* and *Lolita Miranda, Assistant Solicitor General,* for intervener.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question to be decided in this appeal is whether the holding of a second hearing of a charge of larceny before another jury constitutes double jeopardy under Rule 64(e)[1] of the Rules of Criminal Procedure, because the trial court before which the first hearing was held (1) allowed an amendment to the information after the evidence for the defense had been introduced for the purpose of eliminating a variance between the pleadings and the evidence, so that instead of charging the stealing of parts of an automobile, it should be stated that the petitioner stole said vehicle, and (2) with petitioner's consent it postponed the trial so that it be held before another jury, pursuant to Rule 38(d)[2] of the

---

[1] Rule 64(e) provides that:

"The motion to dismiss the information or complaint, or any count thereof, shall be based only on one or more of the following grounds:

"..

"(e) That the defendant has been convicted *or placed in jeopardy* or has been acquitted of the offense charged. If the motion to dismiss is based on this ground, it shall state the name under which the defendant was convicted or placed in jeopardy or acquitted, and the date, court and place of conviction, former jeopardy or former acquittal. The motion to dismiss may be filed by any defendant who shall have been acquitted on the merits of the case, notwithstanding any defect in the information or complaint." (Italics ours.)

[2] Rule 38(d) provides that:

"..

Rules of Criminal Procedure. We believe that under such circumstances the defense of double jeopardy should not prosper.

To the effects of a better understanding of the question raised, it is necessary to make a summary of the evidence introduced by the parties and of the subsequent incidents.

In the case of *People* v. *Osvaldo Ortiz Báez*, Criminal G-66-103, the trial began on November 9, 1966, in the Superior Court, Ponce Part. At that time petitioner herein was charged with stealing several parts from the automobile belonging to Eligio López Rivera, valued in more than $100.

The prosecuting attorney presented his opening statement to the jury and told them that he would seek to establish that on January 10, 1966, Eligio López Rivera arrived at the ward Pulguillas in Coamo, in his automobile, or which was in his name, and left it parked in front of the house of one of his aunts; that on the morning of the next day the automobile had disappeared from the place; that he complained to the police and afterwards the vehicle appeared at the ward Matón in Cayey, dismantled of its parts and burnt; that the parts of the car were subsequently sold by defendant and someone else to different persons; that the parts sold were taken from the vehicle and coincided with those of the vehicle which had been stolen from Eligio López.

---

"(d) Variance between pleadings and the evidence. *The court may allow amendments to be made to the information,* complaint or to a bill of particulars at any time before the conviction or acquittal of the defendant, *in case there is a variance between these pleadings and the evidence.* The variance between the pleadings and the evidence shall not constitute grounds for the acquittal of the defendant; but *the court shall, provided the defendant does not oppose it, postpone the trial if the substantial rights of the defendant have been impaired, to hold it before another jury* or before the same court if the trial is not by jury, and as determined by the court.

"If *the discrepancy or variance is of such nature that the evidence establishes an offense different from the one charged* against the defendant, and not included therein, or if it establishes an offense beyond the jurisdiction of the court, *the jury shall be discharged and the case shall be dismissed.*" (Italics ours.)

The first witness for the People was Clotilde López Rodríguez. He testified that he was a · resident · of the ward Pulguillas in Coamo; that Eligio López was his son and that he was now in Vietnam; that on or about January 12, 1966, his son had a 1956 yellow and black Chevrolet automobile bought by the witness, and which he valued at $1,500 after having repaired it; that the vehicle was in his name and that his son used it; that on January 11, his son came to his house and parked the vehicle in front of his aunt's house; that during that night they did not use the car, and in the morning the vehicle was not there. They notified the Aibonito police station that same day. He saw the vehicle again, burnt, on the 14th, when the police notified them that they had found it in Cayey. The motor, the tires, and the transmission were missing.

After this witness was cross-examined and in the absence of the jury, the prosecuting attorney requested to be allowed to amend the information in order that it would state "that the vehicle was owned by Clotilde López Rodríguez, but under the immediate possession of his son Eligio López Rivera." The defense objected, since it understood that the amendment varied the elements of the offense and charged now a different offense. The amendment having been allowed, the trial court asked whether there was any objection to the continuance of the trial, to which the defense answered, first, that it did not have any objection, but later, after other considerations, it stated that the case should continue, and the court so ordered.

Right afterwards, the entire information was read again to the jury with the accepted amendment as transcribed. The proceeding having continued, the prosecuting attorney announced the testimony of Sergio Vargas Miranda. For the second time the court asked whether "the order of the court having been issued, does the defense have any objections to the continuation of the case?" The defense stated: "We do not have any objection to the continuation of the case with the

exception made by the defense." The exception was that it understood that the amended information alleged a different offense.

Sergio Vargas Miranda testified that: He resided at the ward Matón Abajo in Cayey, on January 11 to 12, 1966; that he had known defendant and another person called Rafael Colón Pagán, for 21 years; that on January 12 the witness had his automobile parked with the motor on the floor to repair it, and about ten o'clock in the morning the defendant and Colón Pagán "offered to sell me the motor of that car for the amount of $75." The witness made the transaction in front of Miguel Ángel Rivera, who had a car, and a mechanic named José Antonio Rodríguez; the latter took out the motor from the car and carried it to where the other car was. The vehicle of the motor sold was parked in front of defendant Osvaldo Ortiz Báez' house, it had a yellow colored top, the hood and the lower part were black, and it was a 1956 model. Miguel Ángel Rivera carried away the motor bought and José Antonio Rodríguez installed it. Defendant and Colón Pagán informed him that the motor belonged to them. The witness testified subsequently that defendant and Colón Pagán sold the tires to Andrés Cartagena, also a resident of that ward. Afterwards, the police arrived and told them that the motor did not belong to them, that it was stolen and wanted to take the parts away. The witness did not object to their taking the parts away and his car with the installed motor also. Besides the motor, he bought from the defendant and Colón Pagán, the transmission and the radiator for the same $75. He did not know the owner of the vehicle and said that if he had known that the vehicle was stolen he would not have bought that.

The cross-examination of witness Vargas Miranda sought to establish that the person who actually stole the vehicle in question was Vargas Miranda himself.

Andrés Cartagena testified that on or about January 1966 he was a public carrier between Cayey and Aibonito; that he knew the defendant, they had been born in the same ward, as well as Rafael Colón Pagán; that on January 11, 1966 defendant Ortiz Báez and Colón Pagán went to offer him the tires and to sell them to him cheap; the witness agreed to buy them and they told him that they were from a car which they had bought and were selling the tires because they needed money. He gave them $10 and later would give them $10 more for three tires and their rims, yellow colored; that he saw the car from which the tires were taken at a farm in Matón, and Rafael Colón took him there. Ortiz Báez was waiting for him. The witness used two tires on his automobile and when he found out something later on, he returned the tires to defendant Ortiz Báez and to Colón Pagán, and called the police. Defendant and Colón Pagán told him not to worry, that he could use the tires because the car was not going to appear.

During cross-examination Cartagena accepted that when he bought the tires, the rims were painted yellow and that he painted them red. He said that he knew that the defendant did not know how to drive, nor did he have a driver's license. The witness stated that defendant and his companion had told him not to worry, that they had already gotten rid of the car; that they had stolen the car in Pulguillas, and to keep silent, that nothing was going to be known.

José Antonio Rodríguez testified that Vargas' car broke down in front of where the witness lived and Vargas told him that he was going to buy a motor to install in it. The witness took out the broken motor. Miguel Ángel Rivera brought a motor in order that the witness would install it as he did in Vargas' vehicle. He does not know where the motor came from. On cross-examination he denied having seen the transaction about that motor with defendant.

Witness Argimiro Ortiz Vega testified afterwards. He said that he had bought from Eligio López Rivera a Chevrolet motor for his car, a 1956 model. The motor having been installed in his car, the police came to investigate and found the motor's number. It was No. 0095767 F 562. During cross-examination he could not recall his social security number, which he had since 1950.

The next witness for the People was agent Antonio Espada. He said that he made the investigation of the stolen automobile which appeared dismantled at the ward Matón. Andrés Cartagena informed the case. He and a detective interviewed Vargas, who told them that he had bought the motor from Osvaldo Ortiz Báez, including the license plate No. 879-008. He did not examine defendant before submitting the case because he had gone away from the ward. On cross-examination he said that the burnt car did not have a license plate. It was given to him by witness Sergio Vargas, who "during the search found it and gave it to me." He found Sergio Vargas on the road with parts of the missing car. He testified that "Sergio Vargas was never charged with anything . . . he was voluntarily cooperating in the investigation with us."

At the close of the evidence for the prosecution, the defense filed a motion for nonsuit because the stolen parts had not been identified and the value of the same had not been proven to the effects of grand larceny. The trial court denied this motion because it understood that it had been established that the value of the identified vehicle amounted to $1,500 and that "the evidence which there is before this court is the value of the original cost of that car and the repair, and the only parts with proven value of $95, $75 for the motor, taking this as true, and $20 for the tires."

It seems evident that since the beginning of the first trial in the case, it was sought to establish, within the purview of

the facts set forth in the information, the larceny of the Chevrolet vehicle belonging to Eligio López Rivera, but recorded under the name of his father, Clotilde López Rivera. The trial court understood it when it denied the motion to acquit.

Miguel Ángel Rivera, witness waived by the prosecuting attorney, testified for the defense. He testified that on January 13 or 14, 1966, Sergio Vargas Miranda asked him to bring a motor to be installed on his 1956 Chevrolet car; that this vehicle had not been running for two months; that Vargas had the motor hanging from a tree near a car which Vargas told him he had bought "at the ward Pulguillas in Aibonito." That at no time did he see transactions with that motor between defendant and Vargas, nor with Rafael Colón; that defendant does not know how to drive an automobile; that the next day Vargas went to the witness' house accompanied by a brother and asked the witness' brother for a gallon of gasoline, which he was given, without saying for what he wanted it; that Vargas went from there towards his house, and about four or five minutes later he saw how the car which they had there and to which he had gone to get the motor, caught fire. The cross-examination of this witness consisted mostly in the confrontation with the sworn statement which he had rendered previously, to which the prosecuting attorney submitted him. The witness stated that he only knew how to sign, but that he did not know how to read. The former sworn statement was introduced in evidence and was read to the jury. The witness ratified that what had been testified in court was correct. He denied having testified to the prosecuting attorney that defendant and Colón Pagán had stolen those parts.

With the prosecuting attorney's objection, the trial court heard the testimony of the witness for the defense Antonio Ortiz Báez, defendant's brother. He stated that on January 12, 1966, at noon, he saw Sergio Vargas taking out the

motor from the 1956 Chevrolet vehicle, in the presence of José Antonio Rodríguez. Neither defendant nor Colón Pagán was there. The prosecuting attorney waived the cross-examination of this witness in conformance with his objection to his testimony.

The last witness for the defense was Rafael Colón Pagán. He stated that on January 11, 1966, at 8:30 in the evening, Sergio Vargas went to ask him to drive him to the ward Pulguillas in Coamo, to look for a car which he had bought. The witness refused because he did not have a car, he had sold his some days before in order to go to New York; that Sergio Vargas' 1956 Chevrolet had been defective for two months; that Ángel Luis Rivera agreed to take him to the place and the witness accompanied them because Rivera only had a learner's permit. On the road they picked up defendant Ortiz Báez; that when they arrived at the ward Pulguillas, Vargas said to leave him there because he was going to see his girl and afterwards he would return in the car which he had bought, and from there they returned home. That the next day Vargas asked him to tell Andrés Cartagena to see him in order to deliver him some tires, that they had already talked about that business; that afterwards, Cartagena told him that he had bought the tires from Sergio. The witness said that he worked earning $60 weekly, and that on Friday 14, he left for New York until May. He was accused for these facts.

When the sitting of the trial court was resumed, after an adjournment, the prosecuting attorney requested an amendment of the allegations in the information "relying on the provisions of Rule 38 of the Rules of Criminal Procedure, in the sense that defendant be charged . . . instead of having stolen parts of a 1956 Chevrolet automobile, license plate 879-008, let it be corrected and stated that defendant stole the whole vehicle. . . ."

Appellant objected to the amendment in question because it was untimely and it charged a completely different offense; that being at the stage of the evidence for the defense "we are not ready to represent defendant in a case which is supposed to answer for some parts and now it is for the entire car." It is apparent from the record that the ground of the defense is that the amendment in question alleges a different offense from the one originally alleged, and that therefore, it does not lie pursuant to the provisions of Rule 38(d).

The trial judge determined, then, that "with this amendment defendant's fundamental rights are prejudiced, and therefore, the trial should be continued to be held before another jury, . . ." and he asked whether the defense would be opposed thereto. We conclude that he was correct in determining that defendant's substantial rights had been prejudiced in view of the defense's allegation that it was not ready to face the amended information.

The defense repeated, in effect, that the amendment was untimely and that it was not ready to continue the case with that amendment; repeatedly it objected to the continuation of the hearing of the case in consonance with its contention that the amendment entails the allegation of a different offense. It indicates that "the contention which we would make if the case is set for another day would be precisely to object even to the hearing of the case," thus establishing the ground for its contention of a different offense. Finally, it argues that "If the case is heard before another jury it would be precisely double jeopardy."

Before such stubborn opposition of the defense, the trial judge ordered the continuation of the hearing of the case on the basis of the amended information. When the defense was asked whether it needed time, it answered half an hour. The defense added that ". . . we are opposed to that amendment, if Your Honor decides to continue or not, as Your

Honor has said that we are going to continue with the case, I have no other alternative than to obey the order of Your Honor; I am forced to obey the order, as an attorney that is what I have to do, and I continue hearing the case and *I oppose not only to the hearing before another jury, but I understand that it cannot be heard either by this jury or by any other jury, that is, that nothing can be heard."* (Italics ours.) This contention, I repeat once more, is grounded, as the defense constantly argued, on the fact that the amendment alleges a different offense.

When the sitting was resumed, after the half hour adjournment, the trial judge repeated again that he understood that the trial should be continued to be heard before another jury and again asked the defense whether it was opposed thereto. The latter answered *"we do not oppose Your Honor setting it to be heard before another jury, but without waiving any right to protect the defendant."* (Italics ours.)

■ We do not doubt that this last statement of the defense constitutes an express, clear, and explicit consent, which does not leave any doubt that it was given to the continuance of the case to be heard before another jury, pursuant to the provisions of Rule 38 (d). The statement without waiving any of defendant's rights does not render said consent less express, clear, or explicit, since it necessarily referred to the contention so many times previously made that the amendment did not lie because it alleged a different offense and, therefore, the proceeding should be dismissed as provided in, the second paragraph of Rule 38 (d). The certainty of this is verified by the fact that when the second hearing of the case was commenced before another jury, the defense raised the impropriety of the amendment and ratified its original position to the effect that the matter should be dismissed pursuant to Rule 38 (d), paragraph 2, in view of its opinion that the second amendment charged a different offense, contention which was rejected again when the judge who presided at the second

hearing of the case concluded that the same offense of larceny was involved.

In *Ríos Mora* v. *Superior Court*, 95 P.R.R. 115 (1967), an amendment to the information having been requested at the close of the evidence for the prosecution, the jury having been discharged, and the case having been set for a new trial, and the question of former jeopardy having been raised, we said that:

"Without considering whether the amendment proposed by the prosecuting attorney was actually necessary, since apparently there was no such incongruency or variance between the pleadings and the evidence to warrant the application of Rule 38(d), the truth is that the action of the court in permitting the amendment did not impair defendant's right to a fair and impartial trial. In allowing the amendment the court offered the defense the alternative of continuing with the hearing or of discharging the jury and granting a new trial. But the defense did not accept either the one or the other.

"The attitude assumed by the defense in the sense of opposing to the continuation of the hearing forced the presiding judge to adopt the measure which he believed was less prejudicial to defendant, which was to discharge the jury and start a new trial. It was the least prejudicial, since in view of the attitude of the defense to object to the continuation of the trial, the court would have had to assign to him another attorney, who evidently could not offer, even if the continuation of the hearing was postponed so that he could confer with the defendant and the witnesses, the same assistance that the attorneys who had attended him from the onset of the proceeding and who were acquainted with all the details of the evidence, could offer him. A new trial was certainly more beneficial to defendant."

We concluded in *Ríos Mora, supra*, that under the attending circumstances of said case former jeopardy could not be invoked to overcome the new trial.

The only difference that exists between *Ríos Mora, supra* and the case at bar consists in that in the former the defense's opposition to the postponement of the case to be heard before

another jury was always maintained, while in the case before us the defense consented at last to such postponement, the procedural situation in issue falling thus fully within the purview of Rule 38(d).

In view of the foregoing, we cannot agree that petitioner has been placed in jeopardy of punishment more than once. This is not a case of double jeopardy. The nature of the amendment of the information in this case was substantial and not merely of defects of form. In our judgment, the judge who presided the first hearing of the case acted correctly, pursuant to the provisions of Rule 38(d) in admitting the amendment in question, and thus conforming the information with the evidence, as well as in insisting to protect defendant's rights in the postponement of the trial to be held before another jury, to which petitioner consented.

Therefore, the writ issued will be quashed and the case remanded to the trial court for further proceedings.

Mr. Chief Justice did not participate herein. Mr. Justice Santana Becerra dissented in a separate opinion in which Mr. Justice Hernández Matos concurs.

—O—

Mr. Justice Santana Becerra, with whom Mr. Justice Hernández Matos concurs, dissenting.

San Juan, Puerto Rico, January 26, 1970

This opinion was originally circulated as the opinion of the Court. As it did not obtain the votes of a majority, I issue it now as a dissenting opinion with some final observations.

—I—

We issued this petition for certiorari to review the order of the Ponce Part of the Superior Court, which denied the dismissal of this criminal prosecution commenced for the

second time, dismissal which was requested relying on the constitutional guarantee which protects the individual against being twice placed in jeopardy of punishment for the same offense.

The Constitution of the Commonwealth of Puerto Rico in its Bill of Rights, Art. II, § 11, provides that:

"No person shall be twice put in jeopardy of punishment for the same offense."

In consonance with the cited constitutional provision and following the former §§ 162 and 169 of the Code of Criminal Procedure—1935 ed.—Rule 64 (e) of the Rules of Criminal Procedure of 1963 allows to request the dismissal of the information or complaint on the following ground:

"(e) That the defendant has been convicted *or placed in jeopardy* or has been acquitted of the offense charged. If the motion to dismiss is based on this ground, it shall state the name under which the defendant was convicted or *placed in jeopardy* or acquitted, and the date, court and place of conviction, former *jeopardy*, or former acquittal."

Rules 38 (d) and 144 (d) and (e) of the Rules of Criminal Procedure are also connected with the problem before us. The first one, 38 (d), allows amendments to the information or complaint or to a bill of particulars and provides that:

"The variance between the pleadings and the evidence shall not constitute grounds for the acquittal of the defendant; but the court shall, *provided the defendant does not oppose it,* postpone the trial if the substantial rights of the defendant have been impaired, to hold it before another jury or before the same court if the trial is not by jury, and as determined by the court.

"If the discrepancy or variance is of such nature that the evidence establishes an offense different from the one charged against the defendant, and not included therein, or if it establishes an offense beyond the jurisdiction of the court, the jury shall be discharged *and the case shall be dismissed.*"

The second, Rule 144(d) and (e) establishes that the court may order the discharge of the jury, before verdict, in the following cases:

"(d) If any error or irregularity should have been committed during the trial which in the opinion of the court precludes the jury from returning a fair and impartial verdict.

"(e) For any other cause by consent of the parties.

"In all cases where a jury is discharged under the provisions of these Rules, ▮ the cause may be tried again."

Expressing ourselves for the Court in *People* v. *Arteaga Torres*, 93 P.R.R. 146 (1966), we said:

"The fact that in discharging a jury *before the verdict*— though not at the request or with the acquiescence of defendant —the court acts on the assumption of subd. (d) copied above of Rule 144 does not establish per se the validity of a second prosecution for the same offense. The reason for this is that there is a constitutional guarantee which protects defendant, not against being twice punished, but against *being twice put in jeopardy* for the same offense. *Downum* v. *United States*, 372 U.S. 734, 736; *Green* v. *United States*, 355 U.S. 184, 188; *United States* v. *Ball*, 163 U.S. 662, 669.

"Hence, the question before us must be passed upon, not only in the light of the permissible authority of Rule 144, but also in pursuance of those constitutional norms which govern the matter and which would also permit or not a second prosecution without violating the guarantee." (Italics in the original.)

In this case we upheld the validity of the second prosecution.

Particularly analyzing the meaning and scope of the above-copied Rule 144(d), in *Piñero Agosto* v. *Superior Court*, decided on March 20, 1967—94 P.R.R. 193—case in which, in the light of its facts and attending circumstances, we upheld the action of the trial court which discharged the jury before the verdict, we again stated: (pp. 202, 203)

"The two important values in the administration of criminal justice which are present in situations like the one in the record, where a jury is discharged and the trial ends before the verdict is entered—on one hand, the guarantee of the integrity of the proceeding and the justice and impartiality of the judgment for both parties and, on the other, the constitutional guarantee which accompanies every individual of not being 'twice put in jeopardy of punishment for the same offense'—require the presiding judge to make the most thorough depuration of the truth of the facts invoked for discharging the jury and a mistrial in the equal protection of both values in play and in the interest of the People and the defendant. Adequate proof of the facts and to establish which of those are true by judicial methods, as we said in *People* v. *Rivera,* 67 P.R.R. 259 (1947), are fundamentally the responsibility of the presiding judge, inasmuch as regarding those true facts thus established he exercises his delicate function and as a rule not so easy to decide, in the exercise of a sound discretion, when and to what extent are the integrity of the proceeding and the pronouncement of a fair and impartial verdict adversely affected for both parties so as to make it imperative to declare a mistrial, even if it involves the constitutional guarantee of the citizen of not being twice put in jeopardy of punishment for the same offense."

We deem it proper to add something else now to the normative principles set forth.

Within that complex and sensitive sui generis mechanism which the Supreme Court of the United States has followed with respect to its federalism and constitutional guarantees of the Bill of Rights of its Constitution—Amendments I to VIII—and which for 136 years has been debated ever since Justice Marshall, in *Barron* v. *Baltimore,* 32 U.S. (7 Pet.) 242 (1833), rejected the proposition that the Bill of Rights as a sole body restricted the action of the state governments;[1]

---

[1] The guarantee involved in the case of Barron was the prohibition of the Fifth Amendment against the taking of private property for public use without a just compensation. Justice Marshall held that this prohibition did not restrict the action of the states. Of course, 64 years later the

and as the Supreme Court has been imposing on the states compliance with certain guarantees of the Bill of Rights under the view that that guarantee partakes "of the very essence of a scheme of ordered liberty";[2] or is part "of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions";[3] or which is among those personal immunities "so rooted in the traditions and conscience of our people as to be ranked as fundamental,"[4] the guarantee of the *Fifth Amendment* against being twice placed in jeopardy of punishment for the same offense had not been considered to be of the aforementioned nature as to impose it on the States through the due process of the Fourteenth Amendment. *Palko* v. *Connecticut*, 302 U.S. 319, 322 (1937).

Still in 1957, Judge Frankfurter, perhaps the most famous exponent and defender of the mechanism of the slow incorporation of the Bill of Rights to the States within that "scheme of ordered liberty or of fundamental immunities so deeply rooted in the traditions and conscience of the people" —against the criteria of applying to the States the total Bill of Rights at once, of which Judge Murphy was one of the most outstanding defenders—expresses himself in *Gore* v. *United States*, 357 U.S. 386, about the double jeopardy, as follows:

"In applying a provision like that of double jeopardy, which is rooted in history *and is not an evolving concept like that of due process,* a long course of adjudication in this Court carries impressive authority."

---

Supreme Court, in *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U.S. 226 (1897), imposed this protection on the states by means of the due process of the Fourteenth Amendment.

[2] *Palko* v. *Connecticut*, 302 U.S. 319.

[3] *Hurtado* v. *California*, 110 U.S. 516.

[4] *Snyder* v. *Massachusetts*, 291 U.S. 97. See: Justice Brennan, Jr., *The Bill of Rights and the States*, James Madison Lecture, New York University, 1961.

However, on June 23, 1969 the Supreme Court, speaking through Justice Marshall, overruled *Palko* v. *Connecticut*, and departed from that long line of impressive case law in *Benton* v. *Maryland*, 395 U.S. 784, 794:

"Only last Term we found that the right to trial by jury in criminal cases was 'fundamental to the American scheme of justice,' *Duncan* v. *Louisiana*, 391 U.S. 145, 149 (1968), and held that the Sixth Amendment right to a jury trial was applicable to the States through the Fourteenth Amendment. For the same reasons, we today find that the *double jeopardy* prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the Fourteenth Amendment. Insofar as it is inconsistent with this holding, *Palko* v. *Connecticut* is overruled.

"*Palko* represented an approach to basic constitutional rights which this Court's recent decisions have rejected. It was cut of the same cloth as *Betts* v. *Brady*, 316 U.S. 455 (1942), [*] the case which held that a criminal defendant's right to counsel was to be determined by deciding in each case whether the denial of that right was 'shocking to the universal sense of justice.' *Id.*, at 462. It relied upon *Twining* v. *New Jersey*, 211 U.S. 78 (1908), which held that the right against compulsory self-incrimination was not an element of Fourteenth Amendment due process. . . . Once it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice,' *Duncan* v. *Louisiana, supra,* at 149, the same constitutional standards apply against both the State and Federal Governments. *Palko*'s roots had thus been cut away years ago. We today only recognize the inevitable."[5]

---

[*] Overruled by *Gideon* v. *Wainwright*, 372 U.S. 335.

[5] Of the 25 substantive and procedural guarantees of the Federal Bill of Rights, under the above-mentioned constitutional federal mechanism, the due process of the Fourteenth Amendment has absorbed the following, imposing them on the States:

(a) All the First Amendment since 1925—*Gitlow* v. *New York*, 268 U.S. 652; *Near* v. *Minnesota*, 283 U.S. 697;

(b) The Fourth Amendment—*Wolf* v. *Colorado*, 338 U.S. 25 (1949), as this decision was affected and complemented by *Mapp* v. *Ohio*, 367 U.S. 643 (1961);

It is significant that notwithstanding the fact that it was now, recently, that the Supreme Court of the United States has decreed that the constitutional guarantee against being placed in jeopardy more than once for the same offense constitutes one of those fundamental and basic guarantees of the American libertarian system of justice and its civil institutions to the extreme of imposing them on the States as the due process of the Fourteenth Amendment, when the contrary had been ruled before, already in 1917 the Congress, which according to *Balzac* v. *Porto Rico*, 258 U.S. 298, was bound to enforce in the territories certain guarantees considered as fundamentals of the Constitution (pp. 312–313), extended the one against double jeopardy and gave it to the inhabitants of Puerto Rico through the Bill of Rights of the Jones Act, and this, despite the fact that at that time it did not extend other guarantees of the federal Bill of Rights. Insofar as Puerto Rico is concerned, apparently the Congress anticipated the criterion of fundamental guarantee against double jeopardy, now consecrated for the benefit of the inhabitants of the States in the decision of *Benton*.

With the foregoing normative principles in mind, let us see the constitutional problem in the light of the facts and circumstances of this case.

---

(c) With the above-mentioned decision of *Benton* v. *Maryland*, the Fifth Amendment has been absorbed, except the clause in relation to information by Grand Jury, *cf. Hurtado* v. *California*, 110 U.S. 516 (1884);

(d) *Pointer* v. *Texas*, 380 U.S. 400 (1965) (confrontation clause), and the more recent decisions of *Klopfer* v. *North Carolina*, 386 U.S. 213 (1967—speedy trial), and *Duncan* v. *Louisiana*, 391 U.S. 145 (1968—trial by jury) finish absorbing the guarantees of the Sixth Amendment;

(e) *Robinson* v. *California*, 370 U.S. 660 (1962), incorporated the guarantee against cruel and unusual punishments of the Eighth Amendment.

Amendments II and III refer to the right of the people to keep and bear arms and the quartering of soldiers; Amendment VII to trial by jury in suits at common law, which has not been incorporated under said mechanism.

—II—

On November 9, 1966, the trial of the case of *People of Puerto Rico* v. *Osvaldo Ortiz Báez*, Criminal G-66-103, for grand larceny, commenced at the Ponce Part of the Superior Court. The jury having been duly impanelled and sworn, by order of the court the clerk proceeded to read them the following information:

"The prosecuting attorney files an information against OSVALDO ORTIZ BAEZ, resident of ward MATÓN ABAJO, Cayey, P.R., for an offense of GRAND LARCENY (Felony), committed in the following manner:

"Said defendant OSVALDO ORTIZ BÁEZ, on or about January 11, 1966, and in Coamo, Puerto Rico, within the jurisdiction of the Superior Court of Puerto Rico, Ponce Part, then and there, said defendant, unlawfully, willfully, and maliciously, and with the criminal intent of profiting himself and depriving absolutely and permanently the legitimate owner of his property, *stole from the automobile of ELIGIO LOPEZ RIVERA several parts valued at more than $100 (one hundred dollars), all of which did not belong to said defendant, but to ELIGIO LOPEZ RIVERA.*

"This fact is contrary to the Act provided for such case and to the peace and dignity of 'The People of Puerto Rico.'

(Signed) PEDRO LUIS RUIZ ORTIZ
Prosecuting Attorney."

*(Italics ours.)*

The prosecuting attorney set forth his opening statement to the jury and told them that he would try to establish that on January 10, 1966, Eligio López Rivera arrived at the ward Pulguillas in Coamo, in his automobile, or which was in his name, and left the vehicle parked in front of the residence of one of his aunts; that the next day in the morning the automobile had disappeared from the place; that he complained to the police and the vehicle appeared afterwards in the ward Matón in Cayey, dismantled of its parts and burnt; that the

parts of the car were subsequently sold by the defendant and someone else to different persons; that the parts sold were taken from the vehicle and coincided with those of the vehicle which had been stolen from Eligio López.

It is apparent, from this moment, that the prosecuting attorney offered to establish the larceny of a car within the frame of the facts stated in the information. The defense did not file objection, nor did the prosecuting attorney offer at that time to amend the allegations. The proceeding was thus commenced.

The first witness for the People was Clotilde López Rodríguez. He testified that he was a resident of the ward Pulguillas in Coamo; that Eligio López was his son and that he was now in Vietnam; that on or about January 12, 1966, his son had a 1956 yellow and black Chevrolet automobile bought by the witness; that the vehicle was in his name and his son used it; that on January 11 his son came to his house and parked the vehicle in front of the house of one of his aunts; that on that night they did not use the car and the next morning the vehicle was not there. They notified the Aibonito police station that same day. He saw the vehicle again burnt on the 14th, when the police notified them that they had found it in Cayey. The motor, the tires, and the transmission were missing. He fixed the value of the vehicle on that date at $1,500.

After this witness was cross-examined, and in absence of the jury, the prosecuting attorney requested leave to amend the information, so that it would read "that the vehicle was owned by Clotilde López Rodríguez, but under the immediate possession of his son, Eligio López Rivera." With the defense's objection, the court granted the motion to amend the information. It then asked if there was any objection to the continuance of the trial, to which the defense answered, first, that it did not have any objection, but afterwards, after other con-

siderations, it stated that the case should continue, and thus the court ordered. (R. I, pp. 25–26.)

Immediately, the information as a whole was again read to the jury with the amendment accepted as transcribed. (R. I, p. 27.) The proceeding continued and the prosecuting attorney announced the testimony of Sergio Vargas Miranda. For the second time the court asked whether "the order of the court having been issued, does the defense have any objection to the continuation of the case?" The defense stated: "We do not have any objection to the continuation of this case, with the exception made by the defense." (R. I, p. 28.) The exception was that it understood that the variance constituted a different offense.

Sergio Vargas Miranda testified in the sense that he was resident of the ward Matón Abajo in Cayey, from January 11 to 12, 1966; that he knew defendant and another person called Rafael Colón Pagán for about 21 years; that on January 12 the witness had his automobile parked with the motor on the floor to repair it and that about 10 o'clock in the morning the defendant and Colón Pagán offered to sell him the motor of that car for $75. The witness made the transaction in the presence of Miguel Ángel Rivera, who had a car, and a mechanic called José Antonio Rodríguez; the latter took out the motor of the car and carried it to where the other car was. The vehicle of the motor sold was parked in front of defendant Osvaldo Ortiz' house, it had a yellow top, the hood and lower part were black, and was a 1956 model. The motor bought was taken by Miguel Ángel Rivera and installed by José Antonio Rodríguez. Defendant and Pagán informed him that the motor was theirs. The witness testified subsequently that defendant and Pagán sold the tires to Andrés Cartagena, also a resident of the ward. Afterwards, the police arrived and they told him that the motor was not theirs, that it was stolen and they wanted to take the parts

away. The witness did not have any objection to their proposal of taking the parts away and also his car with the installed motor. Besides the motor, he bought from defendant and Pagán the transmission and the radiator for the $75. He did not know the owner of the vehicle and said that if he would have known that the vehicle was stolen he would not have bought that.

The defense submitted this witness to an extensive cross-examination which sought to establish that the person who was being charged with larceny of the car was the witness, who admitted that he had a vehicle of the same model and year and needed a motor. For three or four months he had been repairing his car. In effect, the witness stated that the police told him that he was charged with the larceny of the vehicle, that he was examined by three policemen during three days and part of the night in a small room at the police station.[6]

The next witness for the prosecution was Andrés Cartagena Meléndez. He testified that in January 1966 he was public carrier between Cayey and Aibonito; that he knew defendant, that they had been born in the same ward and also Rafael Colón Pagán; that on January 11, 1966 defendant Ortiz and Colón Pagán came to offer him the tires and to give them to him cheap; the witness agreed to buy them and they told him that they were from a car they had bought and were selling him the tires because they needed money. He gave them $10 and was going to give them later $10 more for three tires with their rims, yellow colored; that he saw the car from which the tires were taken at a farm in Matón, and Rafael Colón took him there. Ortiz was waiting for him.

---

[6] On account of this evidence the defense asked to have all the testimony of the witness excluded on the ground that the doctrine of *Escobedo* and *Miranda* had been violated because he had been questioned as a suspect and the pertinent warnings had not been made to him. The court dismissed the exclusion on the ground that the witness was not a defendant.

The witness used two tires on his automobile and when he found out something later, he returned the tires to defendant Ortiz and to Colón, and talked to the police. The defendant and Pagán told him not to worry, that he could use the tires because the car was not going to appear.

This witness was likewise cross-examined, seeking to establish that he had knowledge that the tires were stolen property. He admitted that when he bought the tires the rims were painted yellow and that he painted them red. He said that he knew that defendant did not know how to drive and did not have a driver's license. The witness stated to questions of the prosecuting attorney that defendant and his companion had told him not to worry that they had already gotten rid of the car, that they had stolen the car in Pulguillas, and to keep silent, that nothing was going to be known.

The witness for the prosecution, José Antonio Rodríguez Falcón, followed. He testified that Vargas' car broke down in front of where the witness lived and Vargas told him that he was going to buy the motor to install it; he took out the damaged motor. Miguel Ángel brought the motor and the witness installed it. He does not know from where the motor came. On cross-examination he denied having seen the transaction of this motor with defendant.

Witness Argimiro Ortiz Vega testified later. He said that he bought from Eligio López Rivera a Chevrolet motor for a 1956 car owned by him. The motor having been installed in his car, the police came to investigate and found the number to the motor. It was 0095767 F 562. During cross-examination he could not say from memory the number of his social security, which he had since 1950.

The next witness for the People was policeman Antonio Espada. He said that he made the investigation of that stolen automobile which appeared dismantled at ward Matón. Andrés Cartagena informed the case. They seized the motor

and several parts. He seized the license plate No. 879-008. He did not examine defendant before submitting the case because he had gone away from the ward. On cross-examination he said that the burnt car did not have license plates. These were given to him by witness Sergio Vargas, who had them in his possession. He met Sergio Vargas with the parts of the missing car on the road.

With this evidence and a certificate of the Department of Public Works about the license plate, the prosecuting attorney submitted the case. He waived his witnesses Miguel Ángel Rivera and policeman Zayas. The defense then used the testimony of Miguel Ángel Rivera.

Defendant requested a nonsuit because: (1) the evidence was not sufficient to identify the stolen parts, and (2) the value of the same had not been proven to the effects of grand larceny.

This contention was subject to an extensive discussion between the parties and the magistrate who dismissed the nonsuit, on the ground that there was a complete identification of the stolen parts in the evidence, and that the value of the same could be inferred by the jury from the elements of judgment contained in the evidence. (R. III, pp. 2–16.)

The evidence of the defense having begun, it introduced, as first testimony, the testimony of witness Miguel Ángel Rivera Mercado, witness for the People waived by the prosecuting attorney. He testified that on January 13 or 14, 1966, Sergio Vargas Miranda asked him to bring him a motor to be installed in his 1956 Chevrolet; that this vehicle had not been working for about two months; that the motor which Vargas carried had been hooked to a tree near a car which he told him he had bought at the ward Pulguillas in Aibonito. That he did not see at any time transactions with that motor between defendant and Vargas, nor with Rafael Colón. That defendant does not know how to drive automobiles. That the

next day Vargas went to the witness' house accompanied by a brother and asked the witness' brother for a gallon of gasoline, which he was given, without saying what it was for; that from there Vargas went towards his house, and that 4 or 5 minutes later he saw that the car which they had there, where he had gone to look for the motor, had caught fire. The cross-examination of this witness consisted mostly in the confrontation with his previous sworn statement to which the prosecuting attorney submitted him. The witness stated that he only knew how to sign, but that he did not know how to read. The said previous sworn statement was introduced in evidence and was read to the jury. The witness ratified that what he had testified in court was correct. He denied having testified to the prosecuting attorney that defendant and Colón Pagán had stolen the parts.

With the prosecuting attorney's objection, the court heard the testimony of the witness for the defense, Antonio Ortiz Báez, defendant's brother. He stated that on January 12, 1966, at noon, he saw Sergio Vargas taking out the motor from the 1956 Chevrolet vehicle in the presence of José Antonio Rodríguez. Neither defendant nor Colón Pagán was there. The prosecuting attorney waived the cross-examination of this witness in conformance with his objection to his testimony.

The last witness for the defense was Rafael Colón Pagán. He stated that on January 11, 1966, at 8:30 in the evening, Sergio Vargas came to ask him to drive him to ward Pulguillas in Coamo, to get a car which he had bought. The witness refused because he did not have an automobile, he had sold his some days before in order to go to New York; that Sergio Vargas' 1956 Chevrolet had not been running for two months; that Ángel Luis Rivera agreed to drive him to the place and the witness accompanied them because Rivera only had a learner's license. On the road they picked up defendant Ortiz;

that when they arrived at ward Pulguillas, Vargas told them to leave him there, that he was going to see his girl friend, and afterwards he would return in the car he had bought, and from there they returned home. That the next day Vargas asked him to tell Andrés Cartagena to see him in order to deliver him some tires, that they had talked previously about that business, that afterwards Cartagena told him that he had bought the tires from Sergio. The witness said that he worked earning $60 weekly, and that on Friday 14 he left for New York, until May. He was accused on account of these facts.

After this testimony the court adjourned. When the hearing was resumed the following incidents occurred which we transcribe in their entirety because they are essential to the constitutional question raised: (R. III, pp. 70–81.)

"PROSECUTING ATTORNEY RUIZ:

Judge, before the jury is brought in, this prosecuting attorney, again, is going to request Your Honor an amendment to the allegations of the information relying on the provisions of Rule 38 of the Rules of Criminal Procedure, in the sense that instead of charging defendant Osvaldo Ortiz Báez with having stolen parts of a 1956 Chevrolet automobile, license plate 879008, it be corrected and entered that defendant robbed, stole the automobile in its entirety, the Chevrolet automobile, license plate 879008, 1956 model, belonging to Clotilde López Rodríguez, and which at the moment on which the facts occurred was in the possession of Eligio López.

JUDGE:

Defense.

MR. GOGLAS:

We object to that amendment at this stage, we understand that it is untimely and also we understand that to charge a completely different offense at this stage is untimely; it was not that for which defendant is being tried.

JUDGE:

Well, then, before deciding, the court wants the stenographer

to read the requested amendment. Did the stenographer take that part?

STENOTYPIST:

Yes, judge.

JUDGE:

Could you read that part of the amendment?

STENOTYPIST:

Yes, judge. (The stenotypist reads.)

JUDGE:

And as to the value of the property that was left out? It is alleged that the parts were worth more than one hundred dollars.

PROSECUTING ATTORNEY RUIZ:

It should read that the automobile had a market value higher than the amount of one hundred dollars.

JUDGE:

Alright, that is the petition which the defense has filed, I mean, the prosecuting attorney. We have heard the arguments of the defense in the sense that it objects to the amendment of the information because it is untimely. Are the arguments of the defense well set forth? What does Rule 38 say? In its subdivision 'd' it says: The court may allow amendments to be made to the information, complaint, or to a bill of particulars at any time before the conviction or acquittal of the defendant—at this time there is no conviction or acquittal of the defendant—in case there is a variance between these pleadings and the evidence. The variance between the pleadings and the evidence shall not constitute grounds for the acquittal of the defendant; but the court shall, provided the defendant does not oppose it, postpone the trial if the substantial rights of the defendant have been impaired, to hold it before another jury or before the same court if the trial is not by jury, and as determined by the court.

MR. GOGLAS:

Your Honor, we, expatiating on our objection. . . .

JUDGE:

Continue.

MR. GOGLAS:

. . . if that amendment is allowed, then we are not prepared for that case, as we have been informed.

JUDGE:

Very well.

MR. GOGLAS:

Precisely at this stage we are already in the evidence for the defense, we are not ready to represent the defendant in a case which is supposed to answer for some parts and now is for the entire car.

JUDGE:

Correct, then the court understands that the amendment is proper at this stage because there is still no conviction or acquittal of the defendant. Now, then, what happens?, the court now at this moment, is of the opinion that defendant's substantial rights are impaired with this amendment and, therefore, it is the opinion of this court that the trial should be postponed to be held before another jury or before the same court. Now I ask defendant, would defendant be opposed to the continuance of the case now, in order that it be heard before another jury?

MR. GOGLAS:

I say, our contention is dual, first, that the amendment does not lie at this stage, and second, that we did not come ready to entertain a case according to the amendment made to the information by the colleague and that, therefore, we are not ready, if Your Honor grants that amendment, we are not ready to continue with that case.

JUDGE:

The first decision, colleague, is that the court grants the motion to amend the information in the manner in which the prosecuting attorney says and pursuant to the provisions of Rule 38. That is the first decision. Second decision, the petition of the prosecuting attorney to have the information amended having been granted, relying on the provisions of Rule 38, subd. 'd', the court understands that with the amendment defendant's rights will be impaired and, therefore, in view thereof it asks the defendant whether he opposes to have the proceedings heard before another jury.

MR. GOGLAS:

I say, we object.

JUDGE:

You want the case to continue to be heard with the amendment?

MR. GOGLAS:

We object to the continuation of the hearing of the case.

JUDGE:

Rule 38 is clear.

MR. GOGLAS:

Well, Your Honor, we object to the continuation of the hearing of the case.

JUDGE:

Do you object to its being heard before another jury?

MR. GOGLAS:

Yes, we object, we understand that the case cannot be heard.

JUDGE:

Would the colleague like to see Rule 38?

MR. GOGLAS:

We are acquainted with it, and within your discretion and knowledge of the law, we object.

JUDGE:

To continue hearing the case today?

MR. GOGLAS:

Today, and when the case is set, according to the amendment, we shall make the contention.

JUDGE:

Do you oppose to its being heard before another jury?

MR. GOGLAS:

It is that, excuse me, Your Honor, the contention that we will make if this case is set for another day would be precisely to object even to the hearing.

JUDGE:

Then you want the case to continue?

MR. GOGLAS:

No, we object to the hearing of the case.

JUDGE:

How?

MR. GOGLAS:

To have the case heard before another jury would be, precisely, a double jeopardy.

JUDGE:

The rule, according to our judgment, is clear, Rule 38, subd. 'd', and on that ground we have decided that the amendment lies. What we would like is to have the colleague explain as to this part 'if the defendant does not object, should the trial be postponed,' does the defendant object to continue the case today, even with the amendment? Has the colleague understood?

MR. GOGLAS:

The amendment has been granted and the case is going to continue!

JUDGE:

The rule is clear, I have granted the petition of the prosecuting attorney, and I understand that the substantial rights of the defendant are being impaired because it is a car now, instead of some parts, well, then, relying on the provisions of Rule 38 subd. 'd,' I ask the defendant whether he objects to have the trial heard before another jury.

MR. GOGLAS:

The fact is that we object. We do not want to waive any contention that might favor defendant on account of Your Honor's decision to continue or not the case; we do not want to make any statement on the basis of the question posed by Your Honor, which may be in detriment of any right that may favor the person I represent.

JUDGE:

Well, since the defense objects to have the case heard before another jury, it is proper for us to continue the hearing today. Since the hearing is going to continue with the amendment, I ask the defense if it needs time in view of this new situation.

MR. GOGLAS:

Before answering that question I want to make it very clear, Your Honor, that this attorney, in representation of Osvaldo Ortiz Báez, has not waived, either expressly or impliedly, at any time, any right which might be raised as a result of an infringement or violation of a right which the law and the Constitution grant to my defendant. In other words, our contention is that the prosecuting attorney wants to amend his allegation, Your Honor allows it and we object now to Your Honor continuing or not continuing the case, and we pray Your Honor to decide.

JUDGE:

The rule is clear, colleague, and the defendant and his counsel have to answer categorically, in consonance to what the rule says.

MR. GOGLAS:

That is the problem, we cannot answer categorically.

JUDGE:

You cannot answer whether you object or not?

MR. GOGLAS:

See, what is understood by objecting or not objecting to have it heard before another jury?, that is the first question, if that means, Your Honor, that we object to continue the hearing of the case we are impliedly accepting that another jury should hear it and we are impliedly waiving any contention that might favor the defendant, that is our position.

JUDGE:

Since the defense objects to having the case heard before another jury, the hearing of the case will be continued today to prepare for the new situation which has arisen.

MR. GOGLAS:

Yes, we are going to need time.

JUDGE:

How much time?

MR. GOGLAS:

Half an hour more.

JUDGE:

Certainly.

MR. GOGLAS:

Apparently, we are in the report, Your Honor understands that what I am saying is not what I want to say? I have informed for the record the contention of the defense.

JUDGE:

Tell me, what do you mean then?

MR. GOGLAS:

That we are not waiving at any time any right nor any constitutional or legal right granted by law or by the Constitution to the defendant; that is, that we are opposed to the amendment, but if Your Honor decides to continue or not, since Your

Honor has said that we are going to continue with the case, I cannot do otherwise but to obey Your Honor's order; I am bound to obey the order, and, as a lawyer, that is what I have to do and will continue hearing the case, and I am opposed not only for it to be heard before another jury, but that I understand that it cannot be heard by this nor by any other jury, that is, that it cannot be heard.

JUDGE:

You are opposed to its being heard before a jury?

MR. GOGLAS:

I am opposed in the sense that if this case is heard again before another jury or another judge, or the same judge, defendant's rights will be impaired, so that then, what would be proper is for Your Honor to decide, and Your Honor has concluded that we are going to continue the case, and whatever Your Honor orders, I obey, I cannot do otherwise.

JUDGE:

That is because the colleague is opposed to its being heard before another jury.

MR. GOGLAS:

I am opposed today, whether or not it is proper to hear it before another jury, Your Honor must decide, I am opposed in the most energetic manner to proceed with it today.

JUDGE:

The rule is clear.

MR. GOGLAS:

It is a question of interpretation.

JUDGE:

The rule is very clear, look colleague, what it says: 'the court may allow amendments to be made to the information, complaint or to a bill of particulars at any time before the conviction or acquittal of the defendant, in case there is a variance between these pleadings and the evidence. The variance between the pleadings and the evidence shall not constitute grounds for the acquittal of the defendant; but the court shall, provided the defendant does not oppose it, postpone the trial if the substantial rights of the defendant have been impaired, to hold it before another jury or before the same court if the trial is not by jury,

and as determined by the court.' Then, as the colleague is opposed. . . .

MR. GOGLAS:

We may summarize my contention in the following manner: I am opposed to continue to its hearing as amended, and I am opposed to its being heard before another jury.

JUDGE:

MR. GOGLAS:

In other words, that the case should continue as it was commenced originally.

JUDGE:

Alright, you said you need half an hour?

MR. GOGLAS:

Yes, Your Honor.

JUDGE:

If you need more time let me know. The court adjourns until the colleague states that he is ready.

[After adjournment]

For the continuation of the case, for the record, G-66-103, The People v. Osvaldo Ortiz Báez, grand larceny. Well, an amendment had been requested by the prosecuting attorney relying on Rule 38 subd. 'd,' the court granted the petition for amendment proposed by the prosecuting attorney, and being of the opinion that the substantial rights of the defendant are being impaired, have been impaired, the court understands that the trial should be postponed to be held before another jury and asks the defendant if he is not opposed to the postponement in order to hear the case before another jury, now.

MR. GOGLAS:

Your Honor, we are not opposed to your setting it to be heard before another jury, but without waiving any right which might protect defendant.

JUDGE:

Well, in view of the order entered by the court, and that defendant is not opposed to the postponement so that it be heard before another jury, pursuant to the provisions of Rule 38 of the Rules of Criminal Procedure in effect . . . bring the jury.

[The jury returns to the courtroom]

Do the parties admit that the jury is the same and is complete?

MR. GOGLAS:

Admitted.

PROSECUTING ATTORNEY RUIZ:

Accepted, Judge.

JUDGE:

Well, in view of the fact that the court has granted the amendment filed by the prosecuting attorney, considering that defendant has no objection to the postponement of the trial in order to hear it before another jury as a result of the order issued by the court, the jury is discharged."

—III—

The trial having commenced again on December 14, 1966, the defense made the contention of double jeopardy and requested the dismissal of the same.

Unfortunately, this incident of dismissal was heard before another magistrate and with the intervention of a different prosecuting attorney. None of them had the stenographic transcript of the former proceedings, nor knew them in the detailed manner in which they are revealed in the foregoing Part II. Because of this, the discussion dealt principally with the *first* amendment to the information as to which of the two persons had the *ownership* title of the vehicle, a fact which under the circumstances of the case lacked importance, besides the fact that defendant agreed at that time to continue the prosecution, notwithstanding the amendment, and not with the incident of the *second* amendment which resulted in the discharge of the jury. The defense ratified its original position to the effect that the issue should be dismissed under the authority of Rule 38(d), paragraph 2, considering its view that the second amendment charged a different offense. The respondent judge rejected the defense's position and held that a *different* offense from the one origi-

nally charged was not being charged, but that *the same offense of larceny* was involved (R. IV, pp. 2–14), and refused to dismiss.

1. *Rule 144(d)*

Under this Rule the discharge of the jury before verdict, as it occurred in this case, cannot be justified. This was, in every manner, a completely normal trial without any incident or error which could put in doubt the integrity of the prosecution or its impartiality. Compare the facts in *Piñero Agosto* v. *Superior Court* and in *People* v. *Arteaga Torres*, *supra*, and the cases discussed therein. In *Arteaga*, the magistrate granted sua sponte a new trial in view of an error or nonobservance of the law committed by him, which he reasonably believed was greatly prejudicial to defendant. We upheld the validity of this new prosecution.

Under Rule 144(d) the record establishes the total absence of a state of urgent necessity, or even of necessity, which the doctrine consecrates to justify, in the use of a sound judicial discretion, the discharge of a jury before verdict; discretion which has to be weighed and measured against the constitutional guarantee of double jeopardy, justified solely by the other desirable principle of maintaining the integrity or impartiality of the judicial proceeding. See illustrative expositions on the doctrine of justifying need for the discharge of the jury in the middle of the proceeding: *Carsey* v. *United States*, 392 F.2d 810, 812–816 (D.C. Cir.) ; *Oelke* v. *United States*, 389 F.2d 668, 670–672 (9th Cir.) ; *cert. den.*, 390 U.S. 1029; *McKissick* v. *United States*, 379 F.2d 754, 760–761 (5th Cir.) ; *Augenblick* v. *United States*, 377 F.2d 586, 593–596 (Ct. Cl.), (see *United States* v. *Augenblick*, 393 U.S. 348) ; *United States* v. *Burdick*, 284 F.Supp. 685, 687; *Brock* v. *North Carolina*, 344 U.S. 424; *Wade* v. *Hunter*, 336 U.S. 684; *State* v. *Malouf*, 287 S.W.2d 79, 81–82 (Tenn.) ; *State* v. *Preto*, 144 A.2d 19, 22–25 (N.J.), where

the principle that the discharge of a jury without ground or necessity to justify it amounts to an acquittal, and a second prosecution violates the guarantee against being twice placed in jeopardy is reaffirmed. *State* v. *Romeo*, 181 A.2d 560, 562–564 (N.J.).

Many of the expressions in the cited cases correspond to the less demanding concept of the guarantee before the recent decision of *Benton*. However, the doctrine has been firm in the sense that a manifest necessity should appear in the record to justify the discharge of the jury in order to protect the integrity of the prosecution and avoid the thwarting of justice.

This Court has not departed from that doctrine. In *People* v. *Arteaga, supra,* we continue the citation, at p. 148: (93 P.R.R.)

". . . It may be said briefly of those norms that when there are circumstances in which the ends of substantial justice cannot be attained and *there is a manifest necessity* for so doing, or the ends of justice would otherwise be defeated, a trial may be discontinued and the jury discharged without the consent of defendant or even over his objection, in which case a second prosecution for the same offense would not for that fact alone violate the constitutional guarantee. It is a norm complementary of the former that the discontinuance of a trial in these circumstances should be the product of a sound and conscientious discretion; *the power ought to be used with the greatest caution, for obvious weighty considerations,* and if there is a manifest necessity for so doing. [Citations.]" (Italics ours.)

With the constitutional position assumed last June by the United States Supreme Court in the case of Maryland, the foregoing statements have even more efficacy.

2. *Rule 38(d)*

Under Rule 38(d) the discharge of the jury and discontinuance of the trial before the final verdict does not lie either.

Considering the defense's petition for nonsuit at the close of the evidence for the prosecution, the court had already determined in the ordinary course of the trial that the same was sufficient, as a question of law, within the facts charged in the information in order that the case be submitted to the jury. It was of the opinion that from the evidence presented the jury could infer the value of the parts allegedly stolen, to the effects of the degree of the larceny. In that determination there was no error. See: *People* v. *Gagot Mangual*, 96 P.R.R. 611, 612, 613 (1968).[7] Had the jury convicted defendant, the evidence for the prosecution having been believed, we can hardly see how such conviction would have been reversed on appeal because of insufficient evidence.

In the second place, there was no variance between the evidence for the prosecution presented and the facts alleged in the information. The account in detail of that evidence, *Part II*, establishes palpably the absence of any variance. We do not see the need which the prosecuting attorney could have to amend the information for a second time, particularly after the order in his favor denying the nonsuit. See: *Soto* v. *Superior Court*, 90 P.R.R. 505, 511–513 (1964).

Rule 36 of the Rules of Criminal Procedure sets forth that an information or complaint shall not be insufficient, nor shall the trial or any other prosecution based on the same be affected by any reason of imperfection *of form* which does not tend to prejudice the rights of the defendant. The judge accepted the amendment to the information under the view that it did not charge a different offense and refused to dismiss the proceeding definitively. We are not going to disturb

---

[7] In the light of all the circumstances in the record the jury could infer that an entire motor from an automobile in addition to the rims and their tires, which the evidence pointed out as sold by the defendant, if they believed that evidence, could have a value of more than one hundred dollars, in the absence of evidence to the contrary by the defense which might seek to establish a lower value or to destroy such value.

now such view. Under those circumstances, the constitutional mandate forces him to continue the prosecution, on the other hand entirely normal, until its conclusion. Under the mechanism of Rule 38 (d) he could only discharge it to commence it for a second time with defendant's *consent*.

The entire incident which produced the discharge of the jury has been previously transcribed. It is obvious that defendant did not give his consent to said discharge for another trial. He objected to the continuation of the case because he understood that the amendment charged a completely different offense and that a definite dismissal should have been ordered at that time. He objected, for the same reason, to its discontinuance to commence it again. It would not be proper to bring out of context and to isolate a phrase or statement in the course of a controverted and extensive discussion in order to conclude that defendant consented, contrary to what the complete transcript of the evidence shows.

Even if there were doubts as to the particular, there being involved a basic constitutional guarantee, such *consent* should appear from the record in an express, clear, and explicit manner which does not leave doubt that it was given, as it occurs when basic constitutional guarantees are waived. *Cf. Boykin* v. *Alabama*, 395 U.S. 238, decided June 2, 1969; *Carnley* v. *Cochran*, 369 U.S. 506.

The discharge of the jury in this case and the decision to submit it to a second trial violates § 11 of Art. II of the Constitution of the Commonwealth of Puerto Rico. As it has been said, the guarantee is against being placed in jeopardy of being punished more than once, it does not require having been punished. When his trial was discontinued, petitioner had been placed in jeopardy of being punished in a normal prosecution under a sufficient information and in a competent court.

Up to here, the opinion which was originally circulated.

—IV—

There exists the opinion that this case is ruled by *Ríos Mora* v. *Superior Court,* decided on June 28, 1967. One of our most sensitive functions in the application of the rules of law is to be able to grasp the difference in the facts and circumstances between the cases. Individualizing each case in its facts and circumstances is how justice may be achieved in a certain case. It suffices to read *Ríos Mora,* published in 95 P.R.R. 115, in order for the difference in facts and circumstances to stand out for the purpose of the rule of law therein applied. In that case a majority of the court applied the law under the assumption that a basic variance existed between that information and that evidence. In the instant case there is a total absence of variance, simple or fatal, between the facts charged and alleged and the facts proven by the prosecuting attorney. The information charged the larceny of automobile parts, and the prosecuting attorney brought evidence of the larceny of automobile parts.

I said before that there was no need for the second amendment to the information which gave rise to the discharge of the jury and this controversy. The reading in the record of the incident of nonsuit at the close of the evidence for the prosecution with the extended discussion which arose, as well as some expressions of uncertainty on the magistrate's part as to the applicable law made in the course of the same, notwithstanding the ruling in favor of the prosecuting attorney, create in me the moral certainty that the reason for the amendment was the prosecuting attorney's fear that the jury would not find proven, as a question of fact, in absence of direct evidence, the value of over one hundred dollars of the parts stolen. Hence, the desired change to charge the larceny of the automobile, about which there were statements as to its value.

One of the most damaging and deteriorating practices of the nature of a judicial proceeding is to use the mechanism of the discharge of the jury of Rules 38 and 144 to overcome or avoid deficiencies in the proceeding on the part of the prosecuting attorney, or to overcome or avoid deficiencies of the proceeding on the part of the defense, as well. But in the first case the practice would even be more reprehensible, inasmuch as under our procedural system the prosecuting attorney is bound to prove the offense and the defendant is accompanied by a presumption, here constitutional, of innocence.

Precisely, therein rests the philosophy and nature of this constitutional guarantee, which now is a part of the due process against *placing* the citizen more than once to the rigor of a prosecution, and bars the state from bothering the citizen with consecutive, inefficient or erroneous prosecutions until arriving at a perfect one which leads to his conviction.

Conscious of the importance of this constitutional guarantee, the courts have construed provisions like our Rule 144(d), always in the most restrictive manner against termination of the trial before verdict, and when they have sanctioned it, they have done so just to protect other constitutional guarantees, as is the purity of a just and impartial trial, keystone of the due process of law.

The lawmaker being also conscious of this constitutional guarantee, required in Rule 38(d) that defendant should give his *consent* for the discharge of the jury before the verdict.

It could be tragic for a country that constitutional legislative guarantees do not exist for its citizens. Even more tragic would be that they exist without full effectiveness, as exhibition pieces, showing only what a society has been able to conceive ideologically.

I understand that in the application of the rules of law there are variances of view. To hold, after what the extensive discussion in the record reveals about the incident of the discharge of the jury which I have completely transcribed without omitting any part, that defendant and his counsel consented to said discharge and to be again tried, and that there was the consent required by Rule 38 (d) in a clear manner and without grounds for doubt, as required by the rules of law when a constitutional guarantee is waived, that I do not understand.

In view of the disposition of this appeal, in which petitioner will be submitted to a trial in the Superior Court under an information of the larceny of an automobile, I deliberately refrain from making any conclusion as to the availability of the prosecution without a magistrate having previously determined probable cause against petitioner for the larceny of that vehicle.—Rules 24 (c) and 64 (q) of the Rules of Criminal Procedure.