PBA LOCAL NO. 38, John P. Schreck, Thomas Seabasty, Thomas Szoke, Al Jankowski, Donald Protz, Thomas Cifrondella, Robert Barajas, Russell C. Hilts, Jr., Steve Sexton, Richard Woods, and Lee Schreck on behalf of themselves and others similarly situated, Plaintiffs,

v.

The WOODBRIDGE POLICE DEPARTMENT, the Township of Woodbridge, Joseph Galassi, individually and in his official capacity, Anthony O'Brien, individually and in his official capacity, Walter Zirpolo, individually and in his official capacity, New Jersey Bell Telephone Company, Dictaphone (a Pitney Bowes Company), Mobile Radio Inc. (AKA Frequency Plus), Motorola, Defendants.

Civ. A. No. 89–3314 (MTB).

United States District Court,
D. New Jersey.

Feb. 22, 1991.

Smith, Mullin & Kiernan by Francis A. Polito, West Orange, N.J., for plaintiffs.

Dept. of Law, Tp. of Woodbridge by Timothy M. Casey, Woodbridge, N.J., for Tp. of Woodbridge and Woodbridge Police Dept.

Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl by Anthony M. Campisano, North Brunswick, N.J., for Joseph Galassi.

Palmisano & Goodman by Robert G. Goodman, Woodbridge, N.J., for Anthony O'Brien.

Dwyer, Connell & Lisbona by William T. Connell, Montclair, N.J., for Walter Zirpolo.

Mary B. Rogers, Newark, N.J., for New Jersey Bell Telephone.

Lynch, Martin & Philibosian by Kenneth R. Russell, North Brunswick, N.J., for Dictaphone.

## OPINION

BARRY, District Judge.

## I. INTRODUCTION

Plaintiffs PBA Local No. 38 and John P. Schreck, *et al.* bring this class action against the Township of Woodbridge, its police department and former mayor, the former and present director of police, and various telephone and electronic companies. Plaintiffs' class is comprised of all police officers who worked for the Woodbridge Police Department from 1964 to the present, as well as family members and associates who visited or telephoned police headquarters, who were allegedly subjected to illegal surveillance by the department.

More specifically, plaintiffs allege that several of the "private" telephones at the department were illegally tapped and that listening devices were placed in several of the common areas of the station house. As a result, they continue, many of their private conversations were intercepted in violation of their constitutional, statutory and common law rights. *See* Part II(c), *infra.*

Now before the Court is plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. Also before the Court is defendants' motion to dismiss for failure to comply with various statutes of limitation.

Part One of this opinion will set forth the factual background which gave rise to this suit. Part Two will address threshold individual standing requirements for the named representatives of the class. Part Three will address the propriety of class certification under Rule 23 and will, at least for now, dispose of the statute of limitations issue. For the reasons set forth below, I conclude that although certain of the named plaintiffs have individual standing, this suit is not one which should proceed as a class action. Accordingly, the motion for class certification will be denied. Defendants' motion to dismiss for failure to comply with the applicable statutes of limitation will similarly be denied.

## II. PART ONE: BACKGROUND

II(a). *The Parties*

Plaintiff PBA Local No. 38 is the collective bargaining representative of the officers employed at the Woodbridge Police Department. *See* Complaint at ¶ 10. Plaintiffs John P. Schreck, Thomas Seabasty, Thomas Szoke, Al Jankowski, Donald Protz, Thomas Cifrondella, Robert Barajas, Steve Sexton and Richard Woods are all currently employed as police officers in the department. *Id.* at ¶¶ 11–18, 21. Russell C. Hilts, Jr. is a retired police officer who served in the department from 1968 to 1988. Lee Schreck is the wife of John P. Schreck.

Defendant Joseph Galassi served as Director of the Woodbridge Police Department from 1964 to 1984. *Id.* at ¶ 23. Defendant Anthony O'Brien became Chief of Police in 1974, and Director of Police in 1984. *Id.* at ¶ 24. Defendant Walter Zirpolo, recently deceased, served as Mayor of

the Township from 1962 to 1967. *Id.* at 26. Defendants New Jersey Bell Telephone Company, Dictaphone, Motorola and Mobil Radio are all corporations doing business in the State of New Jersey,[1] and are alleged to have installed or maintained most of the surveillance equipment in question.

II(b). *The Facts*

The headquarters of the Woodbridge Police Department was constructed in 1964 and, at the time of construction or soon thereafter, was equipped with several hidden microphones as well as a "bridge" telephone system which was operable from the Director's office. The microphones were concealed in false air-conditioning vents which were located in three out of nine jail cells, in two different interrogation rooms (later used as offices for the Detectives and Narcotics Bureaus), in the hallway outside of the Director's office, and in the locker room and muster area.[2] In addition, there was a concealed microphone hidden inside the Director's desk. *See* Polito Certification at Exh. C (New Jersey State Police Investigation Report at pp. 00001–00004).

The "bridge" telephone system located in the Director's office was installed in or about 1964 by the Bell Telephone Company.[3] The bridge phone, also known as a "call director", permitted the user of the phone to listen in on the conversations of others. While some of the bridgeable lines in the station house contained an audible beep tone to warn the user that his or her conversation was being monitored, two of the lines did not. These lines, which were designated as 634–6677 and 634–0842, were located in the Detectives and Narcotics Bureaus. *See* Polito Certification at Exh. C (New Jersey State Police Investigation Report at p. 00012).[4]

The police station was also equipped with a recording device located in the basement of the building. This device, which was manufactured by defendant Dictaphone, was designed to record all phone conversations and radio transmissions. *See* Galassi Opposition Brief at 1.

In 1985, after some speculation that the headquarters might be bugged, Director O'Brien invited the New Jersey State Police to conduct an investigation into the eavesdropping capabilities at the station. The police undertook this investigation in June, 1985, and ultimately removed much of the eavesdropping apparatus. The bridge telephone system remained in place, however, until approximately July, 1990, at which time it, too, was apparently removed.[5]

Ultimately, the Deputy Attorney General in charge of the investigation decided not to press any further, largely because he found there to be a "lack of competent and sufficient evidence to establish any illegality attendant to the installation or use of

1. Complete diversity between the parties does not exist. All of the named plaintiffs are citizens of the State of New Jersey, as are the majority of the defendants. *See* Complaint at ¶¶ 10–30. Subsequent to the filing of the complaint, Motorola was dismissed as a party.

2. There is some evidence that the false air-conditioning vents in the locker room and muster area did not in fact contain any microphones. *See* Polito Certification at Exh. C (New Jersey State Police Investigation Report at p. 00003).

3. Although Bell initially installed the equipment, control and maintenance of the account at the police department apparently passed to AT & T after the divestiture of the phone companies on January 1, 1984. *See* Bell Opposition Brief at p. 6 and Exh. B.

4. As indicated, the original phone system was installed by Bell at or about the time the station was constructed in 1964. At the time that the phone system was installed, Bell avers, the New Jersey Board of Public Utilities did not "comprehensively" regulate the use of bridge telephone systems. Approximately ten years after the installation, however, Bell sent a letter to Galassi setting forth what it believed to be the legal parameters under which the bridge phone system could be used. *See* Bell Opposition Brief at pp. 1–2 and Exh. A. Galassi "agreed" by affixing his signature to the letter to only use the telephone for a lawful purpose. *Id.* Other than this letter, there does not appear to be any evidence in the record indicating that the Woodbridge Police Department or Galassi secured any prior approval (either officially or by private agreement) as to the scope of the use of the equipment.

5. The record is not entirely clear concerning the viability of the bridge phone although, as indicated, it appears that this device has been eliminated.

monitoring · equipment located within the Woodbridge [P]olice [D]epartment ..." *See* Galassi Opposition Brief at pp. 2–3 and Exh. A.

## II(c). *Procedural History and Claims*

■ Plaintiffs originally filed an action in the Superior Court, Middlesex County, on May 3, 1988.[6] Their motion for class certification was initially denied by the Hon. Robert A. Longhi, J.S.C., on August 22, 1988. Plaintiffs appealed the decision denying certification, but withdrew their appeal after Judge Longhi vacated his earlier order and certified the class. Judge Longhi did not issue a written opinion regarding the propriety of class certification at any time during the proceedings in the Superior Court. The state action was ultimately dismissed without prejudice.[7] *See* Galassi Opposition Brief at Exh. C.

Plaintiffs' complaint in this Court sets forth six causes of action alleging: 1) deprivation of First, Fourth, and Ninth Amendment rights under color of state law (42 U.S.C. § 1983) (First Count); 2) violation of the New Jersey Wiretapping and Electronic Surveillance Control· Act (N.J.S.A. 2A:156A–1, *et seq.*) (Second Count); 3) violation of the Federal Anti–Wiretapping Statute (18 U.S.C. § 2510 *et seq.*) (Third Count); conspiracy to deprive plaintiffs of their federal constitutional and statutory rights (42 U.S.C. § 1985) (Fourth Count); violation of the right to privacy guaranteed under the constitution and common law of the State of New Jersey (Fifth Count); and

"intentional intrusion upon seclusion" (Sixth Count).[8]

## III.  PART TWO:  STANDING

### III(a).  *Standing: Overview:*

Any litigant in the federal courts, whether he or she sues in his or her individual capacity or as the representative of a class, must have standing to bring a claim sufficient to satisfy the case or controversy requirement within the meaning of Article III of the Constitution of the United States. In particular, a litigant must demonstrate that he or she has a "personal stake" in the outcome of the suit by demonstrating both a "distinct and palpable injury", *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and a " 'fairly traceable' causal connection between the claimed injury and the challenged conduct". *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978) (*quoting Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)). The latter requirement—demonstrating a causal connection—may be met by showing that there is a "substantial likelihood" that the relief requested of the court will redress the claimed injury. *Id.* 438 U.S. at 75 and n. 20, 98 S.Ct. at 2631 and n. 20.

The standing requirement works to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illu-

---

**6.** Plaintiffs' complaint in the Superior Court did not name Bell, Dictaphone, Mobile Radio or Motorola, as defendants and Richard Woods was not named as a plaintiff. Woods, who began his employment with the police department after the state removed much of the surveillance equipment in 1985, was added to "represent additional proposed class members based on new information of electronic surveillance continuing at Woodbridge Police Headquarters after June of 1985". Plaintiffs' Movant Brief at p. 3.

**7.** None of the parties has supplied a reason for the dismissal. I note in passing that plaintiffs have argued that Judge Longhi's order certifying the class is the law of the case estopping opposition to certification here. This argument is without merit. "A dismissal without preju-

dice leaves the situation ... the same as though the suit had never been brought". 5 Moore's Federal Practice ¶ 41.05[2] (1888 & Cum.Supp. 1989–1990).

**8.** As is obvious from the complaint, the wellspring of plaintiffs' claims is the allegation that their Fourth Amendment rights were violated, as it is from this claim that their other causes of action flow. Recognizing this fact, the parties have generally focused their attention on the propriety of class certification as it relates to the alleged violation of plaintiffs' Fourth Amendment rights. As will become evident below, the analysis regarding class certification does not vary in any material respect *vis a vis* the other claims presented and accordingly, I too will focus my attention on the Fourth Amendment claim.

mination of difficult constitutional questions". *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The requirement also ensures that courts will not issue unnecessary or speculative pronouncements on the law.

III(b). *Standing and the Ability to Bring a Class Action:*

One cannot acquire individual standing by virtue of bringing a class action and, conversely, the establishment of individual standing does not confer the ability to maintain a class action. In considering a motion for class certification, the Court must first ascertain whether a named plaintiff possesses the requisite "personal stake" in the outcome of the litigation (conferring general power to litigate) and next, whether the separate criteria established under Rule 23 are met (conferring authorization to litigate on behalf of a similarly situated group). *See* H. Newberg, *Newberg On Class Actions* § 2.05 (2nd Ed. 1985). Thus, a named plaintiff must demonstrate both that he or she has a personal stake in the outcome of the litigation and, among other things, that his or her claims are typical of those he or she purports to represent and that he or she would be adequate to represent the class.

Chief Justice Burger summarized the law in this area in his separate opinion in *Allee v. Medrano:*

> We have recently held in *O'Shea v. Littleton, supra,* [414 U.S. 488] at 493 [94 S.Ct. 669, 674, 38 L.Ed.2d 674] [1974], that standing must be personal to and satisfied by "those who seek to invoke the power of the federal courts". See also *Bailey v. Patterson*, 369 U.S. 31, 32–33 [82 S.Ct. 549, 550–51, 7 L.Ed.2d 512] (1962); *Long v. District of Columbia*, 152 U.S. App.D.C. 187, 190, 469 F.2d 927, 930 (1972). If an individual named appellee was and is subject to prosecu-

tion under one of the challenged statutes, that appellee would have standing to challenge the constitutionality of that statute. If an individual named appellee was and is threatened with prosecution under one of the extant statutes, that appellee would have standing to challenge its constitutionality. Prosecutions instituted against persons who are not named plaintiffs cannot form the basis for standing of those who bring an action. *In particular, a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named as plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action. O'Shea v. Littleton, supra, Bailey v. Patterson, supra,* [369 U.S.] at 32–33 [82 S.Ct. at 550–51]. [emphasis added].

*See Allee v. Medrano,* 416 U.S. 802, 828–829, 94 S.Ct. 2191, 2206–07, 40 L.Ed.2d 566 (1974) (remarks also set forth in Newberg, *supra,* at § 2.06). Stated somewhat differently, albeit in another context, plaintiffs "may only litigate what has happened to them....". *See INS v. Delgado,* 466 U.S. 210, 221, 104 S.Ct. 1758, 1765, 80 L.Ed.2d 247 (1984).

■ If it is ascertained that no named plaintiff has standing to sue, the complaint must be dismissed, and the propriety of certifying the class is an issue which need not be reached.[9] Once it is ascertained that there is a named plaintiff with the requisite standing, however, there is no requirement that the members of the class also proffer such evidence.

III(c). *Standing In The Present Litigation:*

■ At a minimum, a named plaintiff must demonstrate the actual interception

---

**9.** In *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), a civil rights class action, the Supreme Court upheld dismissal of the litigation before any class determination due to a lack of standing. As Newberg has noted in this regard, "Care must be taken, when dealing with apparently standing-related concepts in a class action context, to analyze indi-

vidual standing requirements separately and apart from Rule 23 class prerequisites. Though the concepts appear related, in that they both seek to measure whether the proper party is before the court to tender the issues for litigation, they are in fact independent criteria." *See* Newberg, *supra,* at § 2.09.

of at least one of his or her conversations before there can be a justiciable controversy within the meaning of Article III. Where there has been no interception, there can have been no injury. As the Supreme Court of the United States noted in *United States v. Karo:*

> [The existence of the beeper] created a *potential* for an invasion of privacy, but we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment. A holding to that effect would mean that a policeman walking down the street carrying a parabolic microphone capable of picking up conversations in nearby homes would be engaging in a search even if the microphone were not turned on. It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence.

*See United States v. Karo,* 468 U.S. 705, 712, 104 S.Ct. 3296, 3301, 82 L.Ed.2d 530 (1984) (emphasis in original).[10]

Only two of the named individual plaintiffs have submitted certifications purporting to show their personal stake in the litigation and, thus, absent further submissions, only those plaintiffs may continue to litigate this case, class or no class.[11] More particularly, both Schreck and Barajas have indicated that, in the course of discovery, they have listened to police tape recordings of their personal conversations and at least one interception took place as to each of these plaintiffs. *See* Certification of John P. Schreck, dated September 11, 1990 at ¶ 4; Certification of Robert J. Barajas, dated September 14, 1990 at ¶ 4. These assertions are sufficient to confer standing.[12] Whether or not these conversations were subject to the protections of the United States and New Jersey constitutions, or the strictures of United States or New Jersey statutory and common law is an issue I need not now decide, and I express no opinion thereon at this time.

## IV.  PART THREE:  CLASS CERTIFICATION

IV(a).  *Class Certification: Overview:*

■ In order to maintain a class action, plaintiffs must demonstrate both that they meet the threshold requirements established in Fed.R.Civ.P. 23(a), and that their cause of action falls within one of the procedural molds set forth in Fed.R.Civ.P. 23(b). The first two prerequisites of Rule 23(a), *i.e.,* joinder impracticability and common questions, focus on characteristics of the class. The second two prerequisites, *i.e.,* typicality and adequate representation, focus on the desired characteristics of the class representatives. Newberg, *supra,* at § 3.13. It is constitutionally mandated that the requirements of Rule 23(a) be met if the absent class members are to be bound by the resulting judgment. *See Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Scott v. University of Delaware,* 601 F.2d 76, 84–85 (3rd Cir. 1979). The Rule 23(b) requirements, in turn, are designed to test whether or not, from a practical standpoint, there are any particularly compelling circumstances which make representative litigation appropriate. *See generally,* C. Wright, A. Miller & M. Kane, 7A *Federal Practice and Procedure* § 1772 (2nd Ed.1986). While the

---

**10.** Similarly, 18 U.S.C. § 2511 by its own terms also requires that there have been an "interception". *See also Broadway v. City of Montgomery, Alabama,* 530 F.2d 657, 660 (5th Cir.1976). The same is also true of the New Jersey Wiretapping and Electronic Surveillance Control Act. *See* N.J.S.A. 2A:156A–3.

**11.** I express no opinion at this time on the ability of plaintiff PBA Local No. 38 to sue on behalf of its members, an issue which none of the parties has adequately addressed.

**12.** The remaining individual named plaintiffs have made no such showing and, thus, have not shown the presence of individual standing. Stated somewhat differently assuming that the class members they purport to represent have been intercepted, there is no showing that the individual named plaintiffs other than Schreck and Barajas share standing with or are part of the class. Standing aside, in terms of Rule 23, their claims are not typical of the class nor could they adequately represent the class. *See* Part IV(b), *infra.*

requirements set forth in part (a) of Rule 23 have been met, those set forth in part (b) have not. Class certification is, therefore, inappropriate and will be denied.

### IV(b). *Class Certification: Threshold Requirements: Rule 23(a):*

Rule 23(a) requires, at a minimum, that the Court determine *first,* that the class is so numerous that joinder of all members is impractical; *second,* that there are questions of law or fact common to the class; *third,* that the claims or defenses of the named plaintiffs are typical of the claims or defenses of the class; and *fourth,* that the named plaintiffs will fairly and adequately protect the interests of the class. These requirements are commonly referred to as "numerosity", "commonality", "typicality", and "adequacy of representation". *See, e.g., Vargas v. Calabrese,* 634 F.Supp. 910, 917–919 (D.N.J.1986).

Prolonged discussion of these requirements is not required. *First,* as to numerosity, plaintiffs assert that there were approximately 122 retired officers who served in the department from 1963 to June of 1985; 160 current officers who were also employed between 1963 and 1985; and 40 officers who have been employed since 1985. *See* Plaintiffs' Movant Brief at pp. 6–7. This number (322), which does not include family members and associates who may have called or visited the station, clearly meets the numerosity requirement. *See, e.g., Smith v. B & O R.R.,* 473 F.Supp. 572, 581 (D.Md.1979) ("Although joinder of these persons [c. 500 individuals] would be theoretically possible, it has been frequently held that impossibility of joinder is not required.... Rather, difficulty or impracticality of joinder is sufficient"). The numerosity requirement is met.

*Second,* as to commonality, it is clear that, if there have been interceptions of the class members, which as of now is anything but clear, the class members—at least in a broad sense—share claims in common. It is also clear that similar questions of law and fact would appear in each complaint if sued upon alone. *See, e.g., Hedges Enterprises, Inc. v. Continental Group,* 81 F.R.D. 461, 465 (E.D.Pa.1979).[13] The commonality requirement is met.

*Third,* as to typicality, the claims of each of the named plaintiffs who have shown individual standing appear to be typical of those they purport to represent. *See, e.g., Scott,* 601 F.2d at 85. The typicality requirement is met. *Id.*

*Fourth,* as to adequacy of representation, plaintiffs' attorneys appear to be "qualified, experienced, and generally able to conduct the proposed litigation", *see Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3rd Cir.1975). In addition, the named plaintiffs do not appear to "have interests antagonistic to those of the class." *See Wetzel,* 508 F.2d at 247. The adequacy of representation standard is met.

### IV(c). *Class Certification: Procedural Requirements: Rule 23(b):*

Once the prerequisites of Rule 23(a) are met, the Court must determine, as indicated, whether or not class certification under one of the three subdivisions of Rule 23(b) is appropriate. The decision regarding certification under Rule 23(b) is a matter largely entrusted to the discretion of the Court. *See Bogus v. American Speech & Hearing Ass'n,* 582 F.2d 277, 289–290 (3rd Cir.1978).

Under Rule 23(b)(1), a class action may be brought where it appears that the prosecution of separate actions by or against individual members would create a risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class", *see* Rule 23(b)(1)(A), or where such prosecution would as a practical matter

---

**13.** The threshold requirement of commonality which requires only that there be a single issue common to all members of the class, Newberg, *supra,* at § 3.10, must, of course, be distinguished from the more rigorous "predominance" requirement set forth in 23(b)(3). It is not necessary at this preliminary stage of the inquiry to determine whether substantially similar claims predominate. *See, e.g., Hedges,* 81 F.R.D. at 465. *See also* Part IV(c).

work prejudice on those not joining in the litigation, as when a limited common fund is at stake. *See* Fed.R.Civ.P. 23(b)(1)(B).

Under Rule 23(b)(2), a class action is maintainable where injunctive relief is sought against a party whose conduct affects the entire class. The paradigmatic version of this suit is a civil rights action seeking to correct discriminatory policies or practices of the government. *See* 1966 Comment to Rule 23(b)(2).

Under Rule 23(b)(3), a class action is maintainable where common questions of law or fact predominate over individual issues, and the class action mechanism is shown to be superior to other forms of relief. The Rule 23(b)(3) action is commonly known as a "damages" class action, and, unlike Rule 23(b)(1) or 23(b)(2) actions, requires individual notice to each member of the class. *See Wetzel*, 508 F.2d at 249.

As an initial matter it is clear that neither a Rule 23(b)(1) nor a Rule 23(b)(2) class action would be appropriate. As to Rule 23(b)(1), plaintiffs have only alleged that, without class certification, there is a danger of "inconsistent rulings". *See* Plaintiffs' Movant Brief at 15. However, "[the] case law has established that Rule 23(b)(1)(A) does not include a situation in which the risk of inconsistent results in a series of individual actions would only mean that the nonclass party might prevail in some cases and not in others, and therefore have to pay damages to some claimants but not others." *See Employers Ins. of Wausau v. Federal Deposit Ins.*, 112 F.R.D. 52, 54 (E.D.Tenn.1986). Rather, it must be shown that, without class certification, the nonclass party will be obligated to undertake different and incompatible affirmative relief. *Id.* Here, the prosecution of separate actions will not establish a standard of conduct for the party opposing the class, much less pose a risk of establishing incompatible standards of conduct, given that the conduct at issue has ceased. There is, therefore, simply no showing that a Rule 23(b)(1)(A) class would be appropriate.

As to a Rule 23(b)(1)(B) class, there is no "common fund" or anything akin thereto, the most common use of this subsection, which indicates that prejudice would result as a practical matter to members not party to the adjudication, *e.g.*, where an apportionment or determination of the interests of one class member in a fixed asset or piece of property cannot be made without affecting the proportionate interests of the other class members similarly situated. *See* Newberg, *supra*, at § 4.09. Accordingly, class certification under this rule is inappropriate as well.

As to Rule 23(b)(2), it is crystal clear that the requirement that injunctive or declaratory relief be the predominant remedy requested for class members has not been met. Indeed, plaintiffs do not press the existence of an ongoing practice which violates the Fourth Amendment and which will be utilized in the station house in the future. Money damages are what this case is all about, in whole or in part because, the surveillance capabilities having been eliminated, there is nothing left to enjoin. Rule 23(b)(2) is, therefore, inapplicable.

While the propriety of certification pursuant to Rule 23(b)(1) and (2) present relatively straightforward issues, the propriety of certification pursuant to Rule 23(b)(3) is somewhat more complex. The central purpose of Rule 23(b)(3) is to determine whether or not questions of law and fact common to the class predominate over questions affecting only individual class members, and, if so, whether the maintenance of a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See* Fed.R.Civ.P. 23(b)(3). At first blush, it would appear that certification pursuant to Rule 23(b)(3) would be appropriate. Closer scrutiny reveals, however, that with reference to liability, questions of law and fact common to the class simply do not predominate over individual questions. I, therefore, need not decide whether a class action is more advantageous than other methods for handling this controversy although, with predominance lacking, that decision would seem self-evident.

**104**

In those situations where there exists a commonality of issues and fact patterns *vis a vis* the conduct or treatment of all of the class members—an airline disaster, for example—it does, of course, make eminent sense to try the matter as one integrated lawsuit. Proceeding with a class action ensures uniformity of result by guaranteeing that like cases are treated alike. At the same time, the significant overlap between fact patterns and legal issues ensures that there will be no concomitant sacrifice of procedural fairness to any individual member of the class if he or she is required to proceed by way of representative litigation. *See* Advisory Committee Notes to 1966 Amendment to Rule 23; *See also* Newberg, *supra,* at § 4.24 (*noting* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv.L.Rev. 356, 389–390 (1967)).

In those circumstances, however, where liability will vary depending upon the fact-specific conduct or treatment of the individual class members—a case involving fraud where, for example, there are material differences in the representations made or in the kinds or degrees of reliance thereon—there will be no such predominance of issues and, of necessity, no particular gain either from a fairness or an efficiency perspective in certifying the class. *See, e.g., Gilbert v. Woods Marketing, Inc.,* 454 F.Supp. 745 (D.Minn.1978) (fraudulent land scheme involving individual reliance).[14]

On the facts of this case, it is clear that the liability of the defendants as to each named plaintiff and each class member will vary based upon the specific circumstances

under which each interception took place if, indeed, there have been interceptions beyond those noted by officers Schreck and Barajas. In order to establish liability under the Fourth Amendment[15] from the surreptitious bugging of the station house, one would have to establish both that he or she had a reasonable (subjective) expectation of privacy, and that that expectation was one which society is prepared to protect as a matter of law. *See Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *see also Katz,* 389 U.S. at 360–361, 88 S.Ct. at 516–17 (Harlan, J., concurring); *see also Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Absent such a reasonable expectation of privacy, no "search" has taken place, and the strictures of the Fourth Amendment would be inapplicable. *See Smith,* 442 U.S. at 740, 99 S.Ct. at 2580.

As the foregoing formulation indicates, inquiries regarding reasonable expectations of privacy are highly fact-specific in nature, and are inherently linked to a myriad of subtleties regarding individual behavior. As has often been recited, the Fourth Amendment protects "people, [and] not places" in general. *See Katz,* 389 U.S. at 351, 88 S.Ct. at 511. One may, thus, undertake actions within one's home and still not possess a reasonable expectation of privacy, *see Smith, supra* (warrantless electronic surveillance of "private" information necessarily telegraphed to a third party). Or, by contrast, one may undertake actions within a public space but nevertheless retain a reasonable expectation of privacy. *See Katz, supra* (warrantless search of "public" conversations appellant had purposefully attempted to "preserve as pri-

---

**14.** *See also Clark v. Watchie,* 513 F.2d 994 (9th Cir.1975), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975) (predominance not shown in securities case where separate adjudication is required to determine the substance of oral misrepresentations made to each partner); *Spelman v. F & M Bank & Trust Co.* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,426 (N.D.Okla. Dec. 17, 1981) (predominance not shown in securities action; reliance may not be presumed for the class). *Clark* and *Spelman* are briefly noted in Newberg, *supra,* § 4.25, p. 320, n. 252.

**15.** The Fourth Amendment specifically provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*See* U.S. Const., Amend. 4.

vate"). One generally does not possess a reasonable expectation of privacy in a hallway[16] or lobby[17], unless, of course, the public area is secured by locks or other security devices.[18] *See* J. Hall, *Search and Seizure* § 3:17 (summarizing cases).

Here, if one of the named plaintiffs or one of the members of the class had been in a bugged room conversing with another officer while surrounded by strangers and other police personnel, he or she would almost certainly have had no expectation of privacy and, even if he or she did, it would most likely not have been an expectation which society is prepared to protect. *See Smith*, 442 U.S. at 745–746, 99 S.Ct. at 2582–83. If, however, the same officer had been conversing with one or two top union officials after hours in an otherwise deserted room there would have been a high expectation of privacy which might be justified under the circumstances. *Id.*

16. *See United States v. Anderson*, 533 F.2d 1210 (D.C.Cir.1976) (noted in Hall, *supra*, at § 3:17, n. 16).

17. *See United States v. Miguel*, 340 F.2d 812 (2nd Cir.1965), *cert. denied*, 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97 (1965), *reh. denied*, 382 U.S. 922, 86 S.Ct. 296, 15 L.Ed.2d 238 (1965) (noted in Hall, *supra*, § 3:17, n. 17).

18. *See United States v. Carriger*, 541 F.2d 545 (6th Cir.1976) (locked common area of apartment building) (noted in Hall, *supra*, § 3:17, n. 18).

19. The amount of damages suffered by each class member would also have to be adjudicated individually but individual proof as to damages will not preclude a finding of predominance. *See* Newberg, *supra*, at § 4.26, n. 255, quoting Advisory Committee notes.

20. As noted above, the parties have generally recognized that an analysis of the privacy issues as they relate to certification under the Fourth Amendment would also apply to the bulk of the additional causes of action alleged in the complaint. *See supra*, note 8.

With respect to both the Second and Third counts of the complaint, both the New Jersey Wiretapping and Electronic Surveillance and Control Act (N.J.S.A. 2A:156A–1) (Second Count) and the Federal Anti–Wiretapping Statute (18 U.S.C. § 2510) (Third Count) confine the scope of their coverage regarding the intercep-

It follows inexorably that the proofs as to each claim will differ, requiring a multitude of mini-trials, and there will be no clear, *per se* scenario resulting in liability.[19] In the context of a now-familiar fact pattern, it is not at all clear that Katz's conversation would have been protected had he made his call from a modern, open-air telephone, and not from the confines of an older telephone booth which afforded him the ability to enter and "shut the door behind him". *See Katz*, 389 U.S. at 352, 88 S.Ct. at 511. The results might vary still again if Katz had entered the booth but left the door open. *Id.* In the present case, it is clear that these problems alone would make certification under Rule 23(b)(3) inappropriate. Similarly, it would be inappropriate if not impossible to limit the class to a particular common issue or to divide the class into subclasses, each treated as a class. *See* Rule 23(c)(4).[20]

tion of oral, non-telephonic conversations to "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation...." *See* N.J.S.A. 2A:156A–2(b); *see also* 18 U.S.C. § 2510(2) (identical wording). The analysis under both statutes would, thus, generally proceed under the *Katz* framework, albeit with additional nuances. *See, e.g., United States v. Carroll*, 337 F.Supp. 1260, 1263 (D.D.C.1971) (oral communications as defined in 18 U.S.C. § 2510(2) analyzed under *Katz* framework; no liability for interception of "private" telephone conversation from behind closed door of adjoining room in hotel). Thus, the problems regarding class certification *vis a vis* the Fourth Amendment outlined above would persist as to certification of these counts as well. (I acknowledge that the same would not necessarily be true as to the interception of "wire communications" as that term is defined in 18 U.S.C. § 2510(1) and N.J. S.A. 2A:156A–2(a). However, given the rather substantial difficulties otherwise surrounding the prospects of class certification, I will decline to certify this sub-issue in isolation).

With respect to the Fifth and Sixth counts of the complaint alleging a violation of the Constitution and common law of the State of New Jersey a similar, individualized, and fact-rich inquiry would have to be made as to each plaintiff. *See, e.g., State v. Bruzzese*, 94 N.J. 210, 216–217, 463 A.2d 320 (1983) (interpreting N.J. Const., 1947 Art. I, par. 7 ("The right of the people to be secure in their persons, houses,

Even were I to assume that there exists a common nucleus of fact under which conversations were bugged—a prospect which appears doubtful at best—there are several other difficulties regarding certification of plaintiffs' claims. It is obvious, for example, that the law of privacy and electronic surveillance has substantially evolved over the course of the quarter-century period at issue here. The legality of defendants' conduct would thus vary from plaintiff to plaintiff, depending on the date of interception. More specifically, the electronic devices at issue were apparently installed when the station house was constructed, in 1964. *Katz* was decided in 1967, and the provisions of the Federal Anti–Wiretapping Statute only became effective in 1968. Thus pre–1967 intercepts would most likely be governed by the Federal Communications Act of 1934, 47 U.S.C. § 605, the only pertinent statute in this area prior to 1968, while post 1967 intercepts would be governed by *Katz* and its progeny, in tandem with the Federal Anti–Wiretapping Statute. For this reason, as well, there would be no predominance of issues, and class certification would be inappropriate.

While this problem of varying standards could perhaps be handled by sub-dividing the proposed class into different chronological groupings based on the state of the law at various points from 1964 to the present, this would be an awkward task at best which would, in any event, require inquiry into each aggrieved person's claim in order to establish the proper sub-groupings. In short, the length of time at issue coupled with the evolving nature of the law of privacy indicates that common questions of law do not predominate.

IV(d). *Statute of Limitations*

Defendants have attempted to resolve the statute of limitations issue on a class-wide basis, a proposition which is both il-

logical and unwarranted on the facts of this case. The facts make it clear that a resolution of the issue will depend upon highly individualized determinations as to each plaintiff regarding when his or her cause of action may be deemed to have accrued. Thus, for example, claims brought pursuant to 42 U.S.C. § 1983 would be deemed to have accrued as to each plaintiff only when he or she became aware of both the fact of injury and its causal connection to the defendant. *See, e.g., United States v. Kubrick,* 444 U.S. 111, 122–124, 100 S.Ct. 352, 359–60, 62 L.Ed.2d 259 (1979); *see also Sowers v. Bradford Area School Dist.,* 694 F.Supp. 125, 136 (W.D.Pa.1988). Such an inquiry, of course, would be specific to each plaintiff and is one which is obviously ill suited to general disposition on a class-wide basis.

Defendants have attempted to show specific knowledge on the part of the named plaintiffs with standing and, therefore, have attempted to show that those claims are barred by the applicable statutes of limitation. While I harbor grave doubts as to the viability of plaintiffs' claims, I am not yet convinced that either of those named plaintiffs had sufficient knowledge regarding the causal nexus between the existence of the eavesdropping devices and the role of the defendants to enable them to initiate suit until, as they suggest, November, 1987. *See, e.g., Sowers,* 694 F.Supp. at 136. In any event, absent additional clarification on this point, the motion is not one ripe for summary judgment. Ordinarily, of course, the state of mind of each plaintiff regarding knowledge of injury is a question of fact reserved for the jury. *See, e.g., Cowgill v. Raymark Industries, Inc.,* 780 F.2d 324, 329–331 (3rd Cir.1985). Should additional discovery clarify what is now unclear, I will entertain a renewed motion for dismissal on statute of limitations grounds as to a specifically identified plaintiff.

papers, and effects, against unreasonable searches and seizures, shall not be violated ...") simultaneously with the Fourth Amendment to the Constitution of the United States.)

Finally, as to the remaining portions of the complaint alleging deprivation of additional federal rights (First Count), as well as a conspiracy

to violate plaintiffs' civil rights (Fourth Count), it is clear that these allegations derive their legal force from the predicate allegations involving the aforementioned privacy questions. The predicate nature of these claims renders them similarly inappropriate for class certification.

## V. CONCLUSION

For the reasons set forth above, plaintiffs' motion for class certification will be denied. In addition, the action will be dismissed as to all named plaintiffs who have been unable to demonstrate sufficient standing to maintain this suit in their individual capacities. Finally, defendants' cross-motion for dismissal for failure to comply with the applicable statutes of limitation will be denied without prejudice. An appropriate order shall issue.